FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

JOYCE DUKES,                    )
                                )
          Plaintiff,            )
                                )
v.                              )     Case No. CV-98-TMP-2620-NE
                                )
CROWNE HEALTHCARE               )
OF FORT PAYNE, et al.,          )
                                )     **ENTERED**
          Defendants.           )
                                      MAR 2 2 2000

### <u>MEMORANDUM OPINION</u>

This cause is before the court on the motion for summary judgment filed by the defendant, Crowne Investments, Inc., d/b/a Crowne Healthcare of Fort Payne ("Crowne") on November 26, 1999.[1] Essentially, defendant seeks dismissal of all of plaintiff's claims based on the Age Discrimination in Employment Act ("ADEA") because, defendant contends, there is no genuine issue as to any material fact and defendant is entitled to judgment as a matter of law. This matter has been fully briefed and this court has considered the evidence and the arguments set forth by both parties. The parties have not consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c); accordingly, the court enters this memorandum opinion.

---

[1] Although plaintiff pleads her claims against multiple defendants, Crowne is the sole entity that is a party defendant.



## I.  FACTS

Plaintiff Joyce Dukes brought this action pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., ("ADEA"), alleging that she was terminated from her employment in retaliation for her participation in an earlier age discrimination lawsuit filed by her coworkers, and that she was terminated because of her age.  In addition, plaintiff alleges that the defendant's actions in terminating her were willful.[2]

Plaintiff's discrimination claims arise from her employment as a licensed practical nurse ("LPN") at a nursing home in Fort Payne, Alabama, owned by Crowne.  Dukes worked at the nursing home for more than twenty years and was hired long before Crowne became the

---

[2]     Defendant discusses the possibility that plaintiff's allegation of willfulness in Count III could be intended to state a claim of "outrage" or intentional infliction of emotional distress under Alabama state law.  Plaintiff does not address this issue in her response to defendant's motion for summary judgment.  The court does not construe the claim as one asserting "outrage," as it neither pleads the elements of that tort nor asks for relief aside from that available under the ADEA.  The court treats Count III as an ADEA claim that would entitle plaintiff to additional damages.  In any event, however, the facts asserted by plaintiff, even if true, would not rise to the level of egregiousness necessary to support an outrage claim under Alabama's narrow application of this tort. See, e.g., McIsaac v. WZEW-FM Corp.,495 So. 2d 649 (Ala. 1986);  Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1041 (Ala. 1993); American Road Serv. Co. v. Inmon, 394 So. 2d 361, 365 (Ala. 1980).

owner of the facility.  Her primary duties as an LPN were to provide patient care, such as feeding, bathing, and monitoring changes in condition.  In addition, Dukes was required to maintain documentation by "charting" the patient's condition and the care given.  She also had some supervisory duties over the certified nursing assistants ("CNAs") working with her.  Dukes was supervised by the registered nurses ("RNs") working her shift, and by the director of nurses, Mattie Banks.  Banks' supervisor was Walter Williams, the nursing home administrator.

The plaintiff alleges that after Banks became the nursing supervisor, she made comments to or about Dukes that related to her age.  Specifically, Banks said that Dukes was "inherited" and "came with the building."  In addition, plaintiff alleges that Ms. Banks stated on more than one occasion that she liked to hire nurses straight out of school so that she could "mold" them, and that she wanted "young blood" on her nursing staff.  These alleged statements were made sometime before 1996.

In 1996, three nurses who had been terminated by Crowne filed a lawsuit in this district alleging that they were victims of age discrimination.  Dukes made a statement or affidavit in that case, testifying that Banks had said that she wanted "young blood" and nurses she could "mold."  The statement was provided to Crowne in

3

discovery on March 7, 1997. Dukes gave a deposition in that case
on June 4, 1997, and testified to the same or similar statements by
Banks.[3]

Dukes received written warnings from Crowne on three occasions
between March 26, 1997, and the time she was terminated in August
of 1997. She had not received any other disciplinary measures
prior to March 26, 1997. In fact, she was nominated by Williams
for an award as an outstanding employee in the mid 1990s.

Crowne terminated Dukes' employment on August 23, 1999, as a
result of an incident involving a nursing home resident. To
protect the privacy of the resident, he will be referred to only as
the Patient. The series of events that culminated in Dukes'
discharge began on Saturday, August 16, 1997. Dukes was working
her usual shift, the day shift, which was from 6 a.m. until 2 p.m.
Like many of the nursing home residents on the floor to which Dukes
was assigned, the Patient had a feeding tube. One of Dukes' duties

---

[3]      Plaintiff, in her response to Crowne's motion for
summary judgment, states that the deposition took place on
June 4, 1997, and in the same brief states that the deposition
took place on June 4, 1995. Because the deposition excerpts
provided by the plaintiff do not include a cover page, the court
is uncertain as to which date is correct. However, since the
lawsuit appears to have been filed in 1996, the court uses the
1997 date as the date of Dukes' deposition.

was to flush the tube with water every four hours[4] and to administer supplemental nutrition through the tube on those occasions when the Patient failed to eat at least 60 percent of his meal.  The Patient was capable of feeding himself and rarely required the supplemental feeding.

At approximately 9:00 a.m. on Saturday, August 16, 1997, Dukes was working near the Patient's room.  She told a CNA who had been in the Patient's room to let her know if the Patient didn't eat at least 60 percent of his meal so that she could provide a supplement through the feeding tube.  The CNA told her that the Patient no longer had a feeding tube.  Dukes went to investigate and found that the tube was no longer in place, although there was no indication that a doctor had ordered its removal.  Elizabeth Gilbert, an RN, attempted to reinsert a new tube, but found that

---

[4]     The Patient's chart did not reflect the doctor's orders to flush the tube four times a day.  Apparently, those instructions had been mistakenly omitted from the Patient's medication administration record ("MAR") during his most recent re-admission to the nursing home.  However, Dukes testified that the Patient had been a long-time resident of the home, and that his needs were well known by the staff.  She stated that she routinely flushed the tube twice a day, even in the absence of the notation on the Patient's MAR.  In addition, the nurse working the second shift (2 p.m. until 10 p.m.) also would flush the tube two times on her shift, approximately once every four hours.  The tube was not flushed during the night shift (10 p.m. until 6 a.m.), presumably because the Patient would be sleeping.

the opening had begun to close or heal.  Based on this observation,
Crowne concluded that the tube had been missing for at least 24
hours.  The Patient was then transported to the emergency room
where a doctor inserted a new tube.  The Patient was returned to
the nursing home shortly after noon on Saturday, August 16, 1999.

The transfer of the Patient to the emergency room was deemed
an "unusual occurrence" by Williams, the home administrator.  In
accordance with state regulations, Williams reported the incident
to the regulatory agency governing nursing homes and ordered Banks
to conduct an investigation into the missing tube.  In accordance
with the governing regulations, Williams was required to conclude
the investigation within five days of the incident.

Banks began to investigate the incident on the day the tube
was discovered missing.  Banks attempted to obtain statements from
all staff members who had worked with the Patient since August 14,
1999.  There appeared to be a consensus that the tube was in place
as late as the night of August 14, 1999, when the chart reflected
that he was given water through the tube by third-shift LPN Heather
Hooper.  Chart entries apparently made by third-shift LPN Audrey
Tolliver also indicated that the tube was present.  Another LPN,
Lexie Bowman,  stated that she saw Dukes in the Patient's room at
about 6:40 a.m. Friday, August 15, 1999, with a syringe.  She

6

stated that Dukes had the feeding tube in hand, apparently preparing to flush the tube.  A few minutes later, at 6:45 a.m. Friday, a CNA reported that the Patient was given a shower and that the CNA observed that the tube was not present.  At 10:30 a.m. a worker in the laundry room reported that a feeding tube had been sent down the laundry chute, wrapped in a towel.[5]

When Dukes' shift ended on that Saturday, Banks asked Dukes to write out an account of the incident.  In that handwritten account, Dukes stated that she had flushed the Patient's tube twice a day on Thursday, August 14, 1999, but that she was "not for sure" if she had flushed the tube on Friday, August 15, 1999.  When Banks checked the Patient's chart for August 15, 1999, she found entries made by another LPN, Jean Dalrymple, indicating that the tube was present and had been flushed in accordance with the usual practice. Further investigation indicated that Dalrymple had charted the flushing based upon Dukes' assurances that the tube had been checked.  Dalrymple did not check the tube herself.  Banks denies that the nursing staff had ever been told to record procedures on charts unless the nurse charting it had performed or observed the

---

[5]     The nursing home had many patients who had feeding tubes, and the tubes were available in a variety of sizes.  There is no evidence that indicates whether the tube in the laundry was the Patient's tube.

procedure, but Dukes and other nurses assert that Banks had instructed the nurses to "help each other out" with charting duties, and that such charting practices were common at Crowne.

The nurse who worked the shift after Dukes on Friday, August 15, was Connie Smith.  In accordance with the doctor's instruction, Smith was responsible for checking and flushing the tube two times during her shift. At 4 p.m., Smith charted that the Patient, who had a history of being abusive to the staff, was combative and cursing.  She noted that the Patient took his medication by mouth and was given a soft drink by mouth.  There was no notation concerning the tube at 4 p.m., nor were there any further chart notations during Smith's shift concerning the tube. As apparently was customary, the nurse working the late shift did not check the tube and made no chart notations relating to the Patient's tube.

After the Patient was taken to the emergency room on August 16, six nurses, including Dukes, were suspended with pay. Banks asked Dukes to come by the nursing home no later than Tuesday, August 19, to provide Banks with "any additional information" Dukes might have that would be relevant to the investigation.  Dukes went to the nursing home on that Tuesday and provided a note in addition to her statement given on Saturday.

8

She did nothing to contradict the earlier statement that she was not "for sure" if she had flushed the tube on Friday.  Dukes also told Banks that she had no further information.

In addition to the statements taken from the nursing staff and in subsequent interviews, Banks sought additional information in the form of a questionnaire that was distributed to the nurses known to have had contact with the Patient during the relevant time frame.  She asked the suspended nurses to come to the nursing home before the end of the day on Thursday, August 21, to complete the questionnaire.  The plaintiff, who was ill with a migraine headache, declined to come.  Banks offered to send a nursing home employee to Dukes' home with the questionnaire and the Patient's medical records.  Dukes agreed to that arrangement, but refused to complete the questionnaire once she saw it.  She requested that the questionnaire and records be left with her overnight.  The nursing home employee refused to leave the confidential medical records of the Patient with Dukes overnight.  Consequently, the employee returned to the nursing home, and Dukes never completed the questionnaire.

On Thursday, August 21, Williams sent a letter to Dukes via hand delivery, requesting that she provide any relevant information and advising her that a prompt response was imperative or Crowne

would "have to take appropriate action based on the information [then] available."  On Friday, August 22, Dukes' attorney informed Williams that Dukes would be unable to provide the requested information.

On August 23, 1997, Williams notified Dukes that her employment had been terminated.  The letter to Dukes specifically addressed "numerous charting irregularities."  Williams made the decision to terminate Dukes.  In connection with the August 16 incident, Crowne also terminated Heather Hooper and Audrey Tolliver, both of whom were younger than 40 years old.  Williams' letters to both Hooper and Tolliver also cited charting problems as a reason for their termination.  On or before August 21, 1999, Crowne issued written reprimands to Jean Dalrymple, who was over 40, and to Brenda Smith and Connie Smith, both under 40, in connection with the feeding tube incident.  Crowne also gave a written warning to RN Elizabeth Gilbert Black, who was under 40, and demoted her from her supervisory position.  Black resigned from her position at Crowne soon after the demotion.

The Alabama Board of Nursing also conducted an investigation into the incident.  That investigation resulted in the entry of a consent order, signed by Dukes, which indicated that Dukes had entered false information on the Patient's chart and had provided

10

false information to a coworker for entry into the Patient's records.  As a result of the Board of Nursing's findings, Dukes received a public reprimand and was prohibited from working in an unsupervised capacity.

## II.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its

11

case on which it bears the ultimate burden of proof.  _Celotex_, 477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials _negating_ the opponent's claim."  _Id_. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  _Id_. at 324 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  _Celotex_, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  _Id_. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

12

substantive law will identify which facts are material and which are irrelevant. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id</u>. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id</u>. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Id</u>. at 251-52; <u>see also</u> <u>Bill Johnson's Restaurants, Inc. v. N.L.R.B.</u>, 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. <u>Anderson</u>, 477 U.S. at 249 (citations omitted); <u>accord</u> <u>Spence v. Zimmerman</u>, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient

13

evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).   Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.   Anderson, 477 U.S. at 255.   The non-movant need not be given the benefit of every inference but only of every reasonable inference.   Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III.  Discussion

Plaintiff's only claims arise from the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., ("ADEA").   The ADEA prohibits an employer from using the employee's age as a "determining factor" in any decision to terminate the employee. Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453 (11th Cir. 1997).   In order to survive a motion for summary judgment, the plaintiff in an age discrimination case first must establish a prima facie case.   In order to establish the prima facie case of discrimination, a plaintiff may present to the court: (1) direct evidence that   "discriminatory animus played a significant or

14

substantial role in the employment decision," Eskra v. Provident Life and Accident Insurance Company, 125 F.3d 1406, 1411 (11th Cir. 1997), or (2) circumstantial evidence of discrimination, in accordance with the four-part test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed. 2d 668 (1973), or (3) statistical evidence of a pattern of discrimination. Zaben, 129 F.3d at 1457.

Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without requiring the factfinder to make any inferences or presumptions. Carter v. City of Miami, 870 F.2d 578, 580-81 (11th Cir. 1989). When the plaintiff relies upon circumstantial evidence, rather than direct evidence, she creates a presumption of discrimination by establishing a *prima facie* case. The presumption may be rebutted, however, if the employer offers a legitimate, nondiscriminatory reason for the employment action. Once the nondiscriminatory reason is articulated, the burden shifts to the plaintiff to show that the reason is either not worthy of belief, or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proferred reason. Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998) reh'g and reh'g

*en banc* denied, 172 F.2d 884 (11th Cir. 1999), citing <u>Combs v.</u>
<u>Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir. 1997), <u>cert.</u>
<u>denied</u>, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

In this case, Dukes attempts to show both direct and
circumstantial evidence of discrimination. The plaintiff asserts
that the supervisor of nurses made discriminatory remarks and
treated Dukes differently than younger nurses in the same
situation, Connie Smith, Julie McElrath, and Elizabeth Gilbert
Black. Dukes does not offer any statistical evaluation of Crowne's
hiring or firing practices. Essentially, the court must determine
whether the plaintiff has presented competent admissible evidence
that Crowne dismissed Dukes because of her age. <u>United States</u>
<u>Postal Serv. Bd. of Governors v. Aikens</u>, 460 U.S. 711, 715, 103 S.
Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983). It is not the duty of
this court to evaluate whether the decision to fire Dukes was fair
or wise; employers are free to make unfair or unwise employment
decisions so long as they do not violate anti- discrimination
statutes such as the ADEA. See <u>Elrod v. Sears, Roebuck and Co.</u>,
939 F.2d 1466, 1470 (11th Cir. 1991). Questionable business
judgment is not evidence of discrimination. <u>Id</u>.

A. Direct Evidence

Dukes offers some evidence that the court construes as an attempt to prove an ADEA violation by direct evidence.  As direct evidence of discrimination, Dukes and other nurses at Crowne testified that Crowne's director of nursing stated that she liked to have "young blood" on her nursing staff, and that she preferred to hire nurses just out of school whom she could "mold."  In addition Dukes testified, and Banks admitted, that Banks had referred to Dukes as someone who "came with the building."  Dukes also claims that Banks said Dukes was "inherited," which Banks denies.  Dukes claims that such statements are derogatory references to Dukes' age.  These statements, however, even if indicative of some age-based animus, do not provide sufficient support for Dukes' claims.  The statements were made by Banks, and reflect only Banks' alleged animus.  The decision to terminate Dukes, however, was made by Williams.

A similar situation was examined recently by the Eleventh Circuit Court of Appeals.  In Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453 (11th Cir. 1997), the appellate court examined the district court's order granting summary judgment in favor of the employer in a case in which supervisors told one plaintiff that the company wanted to "get rid of its older employees."  Id. at

17

1455.  The supervisors also said that the company wanted younger
employees who could be trained the way the higher officials wanted
them trained.  Id.  The plaintiff was the oldest electrician
employed at the plant, although he had less seniority than others.
In a "position reduction," the company fired the plaintiff.  The
district court held that the statements about getting rid of the
older workers were hearsay and inadmissible, and the appellate
court affirmed, finding: (1) that the statement was not an
admission by a party opponent because the speakers were not the
decision-makers at the company, and (2) that the statements were
"double hearsay" because the animus evidenced by the statements was
attributed to "the company" (presumably higher officials) and not
to the speakers.  Id. at 1456-57.

In this case, there is no "double hearsay" issue presented,
because Banks is both the declarant and the one accused of having
the discriminatory intent.  Plaintiff does not allege, and has
presented no evidence to indicate, that anyone at Crowne other than
Banks harbored any discriminatory intent.  To the contrary, the
statements were specifically phrased in terms of Banks' own desire
for "young blood" and nurses that she could "mold."  There is
nothing to indicate that Williams, or anyone supervising Banks,
instructed or suggested that age should be a factor in the hiring

18

or firing of nurses.  Finally, it is undisputed that the decision

to terminate Dukes was made by Williams and not by Banks.  Banks

testified that Williams recommended the initial suspension of the

nurses and devised, with the assistance of Crowne's attorneys, the

questionnaire given to the nurses.  Williams also ordered the

reporting of the "unusual occurrence" to the state agency and

oversaw Banks' investigation into the feeding tube incident.

Ultimately, Williams made the decision to fire Dukes because of the

apparent falsification of the Patient's chart on Friday, August 15,

coupled with the apparent neglect of the Patient.  There is no

evidence that Banks was given any voice in the ultimate decision to

fire Dukes.  The Eleventh Circuit Court of Appeals has determined

that "a statement by a person who played no part in the adverse

personnel decision is not direct evidence of discrimination."

Eskra, 125 F.3d at 1411.

The defendant has cited several cases in which similar

comments about "young blood" were deemed "stray remarks," and other

cases in which a statement by a supervisor other than the decision-

maker was deemed not probative of discriminatory intent.  See,

e.g., Dilla v. West, 4 F. Supp. 2d 1130, 1140 (M.D. Ala. 1998);

Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1329 (11th Cir.

1998).  Dukes, on the other hand, offers no support for her

19

argument that these statements by Banks prove that Williams'
decision to fire her was the product of an unlawful intent to
discriminate, as necessary under the holding of Standard.  There is
no evidence that Banks influenced Williams, beyond providing him
the facts about Dukes' contact with the Patient, which were
undisputed at the time the decision was made.[6]  Furthermore, Banks'
remarks require an inference that because Banks wanted "young
blood," Williams would be willing to terminate older workers in
order to make room for younger workers.  Because an inference is
required, the evidence falls short of the direct evidence standard.
Furthermore, Banks' statements are ambiguous.  Banks could have
been expressing her desire to have nurses who can be trained in the
manner she wants them trained rather than nurses who have been
taught to do things in another manner.  If so, that statement is
"untainted by unlawful age bias," and cannot constitute direct
evidence of age discrimination under the Dilla analysis.

---

[6]     Dukes' attorneys make much of the fact that Dukes was
rushed and tired when she filled out her initial report on
August 16, 1999, and that she was ill when later asked for
additional information.  The court understands that Dukes' later
recollection - that she did tend to the Patient's tube on August
15 as charted - may well be correct.  However, that fact does not
change the reasonableness of Crowne's decision, which was based
on the best information it had at the time, which Dukes had been
given more than one opportunity to amend, refute or deny.

For all of the reasons set forth above, Banks' statements, while admissible, are woefully insufficient to prove that Dukes' age was a determinative factor in her termination.  In sum, plaintiff has failed to meet her burden by offering direct evidence that Crowne discriminated against her on the basis of her age.


## B. Circumstantial Evidence

Dukes also attempts to prove that Crowne discriminated against her by providing circumstantial evidence of conduct violative of the ADEA.  Plaintiff has succeeded in coming forward to meet the initial burden required by Eleventh Circuit precedent: (1) that she is within the protected group of employees 40 years old or older; (2) that she was qualified for her position;(3) that she was fired; and (4) that a younger person was hired as her replacement.[7]  See Williams v. Vitro Servs. Corp., 144 F.3d 1438 (11th Cir. 1998).

---

[7]     Crowne disputes that Dukes was qualified for her position, and bases its conclusion on the Board of Nursing's consent order that sanctioned Dukes.  However, because this finding of fact was made subsequent to the termination, this Court finds that the consent order does not rebut the element of qualification.  Crowne further disputes that Dukes has shown that she was replaced by a younger nurse, but Crowne has not disputed Dukes' allegations that Connie Smith, who is younger than Dukes, took over Dukes' day shift position immediately upon Dukes' suspension and termination and that Crowne advertised for a nurse to fill Smith's evening shift position.

However, even though plaintiff has met her initial burden, Crowne
has set forth a legitimate, non-discriminatory reason for
terminating Dukes.

Williams, the decision-maker, testified that he terminated
Dukes solely on the basis of her role in the August 16, 1999,
incident.  More specifically, Williams testified that he fired
Dukes because she falsified the patient's chart.  The "charting
irregularities" were noted in the letters terminating Dukes,
Hooper, and Tolliver.  On the other hand, Williams explained that
Connie Smith, a younger nurse who was not fired, had not "charted
something that didn't happen."  Smith, like other employees who
neglected the patient but did not falsify the chart, were
reprimanded rather than terminated.

Because Crowne has offered a nondiscriminatory reason for the
termination, Dukes must, in order to overcome Crowne's motion for
summary judgment, demonstrate by competent, admissible evidence,
that Crowne's nondiscriminatory reason is merely a pretext and that
Crowne's true reason is age-based discrimination.  The reason given
by the employer "cannot be proved to be 'a pretext for
discrimination' unless it is shown both that the reason was false,
and that discrimination was the real reason."  Clark v. Coats &
Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993).  The plaintiff

22

attempts to meet this secondary burden by pointing to the fact that Crowne did not dismiss Connie Smith or Julie McElrath, younger nurses, even though both also apparently failed to carry out their duties with respect to the Patient's feeding tube.

It is undisputed that Smith neglected her duty as the evening shift nurse by failing to check and flush the Patient's feeding tube.   This, Dukes argues, establishes that Smith was not fired even though she engaged in conduct identical to Dukes, and that the reason for the disparate treatment is Smith's age.   Williams, however, draws a distinction between Dukes and Smith.   He notes that while both nurses apparently neglected the Patient, only Dukes was responsible for entries into the Patient's chart that falsely recorded that his tube had been checked and flushed.   The falsification of the records, Williams indicated, makes Dukes' conduct more culpable.

Similarly, the conduct of Julie McElrath can be distinguished from the conduct of Dukes.  McElrath, a treatment nurse, neglected to perform her duty to clean the tube site on Wednesday, August 13, and on Friday, August 15.   However, there is no allegation, much

23

less evidence, that McElrath entered any false information into the Patient's chart.[8]

The third nurse offered by Dukes as a comparator, Elizabeth Black Gilbert, also was never found to have entered false information into a Patient's chart. Gilbert was given a written warning and a demotion for failing to properly supervise the staff, and for failing to enter the doctor's orders onto the Patient's MAR.

The plaintiff has not shown that Williams' proferred distinction is a sham. In fact, Williams' treatment of Hooper and Tolliver, both of whom were under 40, supports the conclusion that falsification of a patient's chart is treated more severely than neglect of a patient. This court's role is not to evaluate the wisdom or fairness of such a conclusion, but merely to determine whether that conclusion was the real reason behind Williams' conduct in firing Dukes or a pretext for age discrimination. Furthermore, the court should determine whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies,

---

[8]     Crowne offers no explanation for the discrepancy between the disciplinary warning issued to Smith and the lack of any disciplinary action taken against McElrath, but since the conduct of both nurses is different from the conduct of Dukes, any disparity of treatment between those two non-parties is irrelevant to this action.

24

incoherencies, or contradictions" in the employer's articulated reason for the termination that it is "unworthy of credence." <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1538 (11th Cir. 1997)(citations omitted).

The court finds little or no support for plaintiff's argument that the distinction is a pretext. Other nurses appear to have been terminated or sanctioned in accordance with that policy. There is little indication that Banks harbored any discriminatory intent toward Dukes, and there is no evidence that Williams shared any such feelings. Furthermore, in light of the serious nature of the incident of August 16, 1999, and in light of Dukes' own statement to Crowne, the facts that Crowne had available to it on August 23, 1999, when Dukes was fired, indicated not only that Dukes had falsified records, but also that Dukes could have been responsible for removing the tube.[9]   Dukes has not offered any

---

[9]     Dukes argues that Crowne disregarded Lexie Bowman's statement that Dukes was in the Patient's room apparently flushing the tube at approximately 6:30 a.m. on August 15.   The court finds that there is no clear indication as to whether Crowne believed or disbelieved Bowman's statement.  However, the court fails to see how Bowman's account helps to exculpate Dukes, since it places her in contact with the tube just minutes before it was missing, and it does nothing to eliminate the inference that Dukes failed to correctly check the tube and document the procedure later in that same shift.  In other words, either Bowman was correct and Dukes still falsified the chart as to the second flushing of the day, or Bowman was mistaken and the tube

25

evidence that any nurse who also was deemed to have falsified records was not sanctioned accordingly. While the court is somewhat mystified by Crowne's reasoning in assigning so little blame to those who clearly neglect a patient, and so much to those who neglect their charting duties, Crowne nevertheless has the right to determine the proper punishments for such actions, so long as the punishments are not unlawfully applied to employees in a protected group. Consequently, the court finds that Crowne's articulated reason is not unworthy of belief and age animus is not the more likely reasons for Dukes' termination. Dukes has failed to meet her secondary burden of showing that Crowne's stated reason for dismissing Dukes was pretextual, and Dukes' claim of age discrimination is subject to summary judgment in favor of Crowne under the McDonnell Douglas test as adopted by the Eleventh Circuit. Williams, 144 F.3d at 1441.

## C.  Retaliatory Discharge

Dukes's claim for retaliatory discharge is due to be dismissed for the same reasons that her claim that the termination was based

---

may have been missing even before 6:45 a.m. on August 15. Under either scenario, Dukes' documentation is suspect, and Crowne's conclusion that the tube was missing for more than 24 hours still is reasonable.

on age discrimination must fail: she cannot show that Crowne's stated reason for the termination is a pretext.

In support of her retaliatory discharge claim, Dukes shows the sequence of events that followed her giving a statement in the 1996 age discrimination case. She has demonstrated that she received written reprimands or other disciplinary measures soon after her involvement in the lawsuit. She also has demonstrated that she was never reprimanded before and had in fact been recognized as an outstanding employee. However, there is no evidence that Dukes' discharge was linked to the disciplinary measures. To the contrary, Williams has stated that the sole reason for Dukes' termination was her conduct in relation to the feeding tube incident.[10]

For all of these reasons, the plaintiff has failed to demonstrate that Crowne unlawfully terminated her employment in retaliation for her participation in the 1996 lawsuit. As a result, Crowne's motion for summary judgment is due to be granted.

---

[10]    While it is clear that Banks and Williams had some knowledge of Dukes' deposition in the 1996 case, both deny having any information concerning the content of Dukes' testimony. Furthermore, Dukes has alleged that she was disciplined for arbitrary or insignificant reasons, but she does not dispute that she committed the acts that led to the reprimands, and she offers no evidence that other nurses were treated differently.

## IV.  CONCLUSION

Based on the foregoing undisputed facts and legal conclusions, the court determines the motion for summary judgment filed by Crowne is due to be GRANTED and this action DISMISSED WITH PREJUDICE.

A separate order will be entered in accordance with the findings set forth herein.

DATED this 21st day of March, 2000.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE

28